If I could reserve three minutes for rebuttal, please. You want three minutes? Yes, please. Keep your hand on the clock. It counts down. Thank you. If it pleases the Court, Julie Goldberg for petitioner. I would like to first briefly highlight some of the issues that were found on the marriage fraud and then move on to the issue of due process. I think one thing that's very important in this case is the timing in which Mr. Alabed actually got to refute some of the evidence and also the focus of USCIS that kind of zoned in on specific stuff and didn't look at the broad picture. One of the things that needs to be kept in mind regarding the evidence in this case is that when the original denial was issued by USCIS in violation of their own procedures and regulations firmly solidified by the BAA, they refused to issue a notice of intent to deny. Moreover, if you look at the original denial decision in this Court's record from 2000, the language that's normally on there that says you have a right to appeal this decision was not on the 2000 decision. And that's important because they were in pro per at the time. So that decision comes, they think it's denied, they obviously have marriage issues. So when the USCIS and the BAA say, hey, you didn't submit a lot of evidence, we have to take into account that the evidence, the first time that he did have an opportunity to refute these claims and present evidence was 13 years after the marriage ended. And that's the first time that he was notified that ---- Was the issue the same all along? In other words, was the original charge you've entered into a fraudulent marriage? Yes, so the ---- So he knew what the issue was that immigration was coming after him on it. But I don't think that 13 years later when he's now married to a U.S. citizen with five U.S. citizen children, he had any idea that that first marriage was ever going to be an issue. So the idea that he would hold on ---- Wait, wait. Didn't he pay the woman in the first marriage? Well, there's conflicting testimony because ---- and I think that this is very important. Well, and didn't he offer the girlfriend that he was living with at the time that he paid the other woman, he offered her money, but she wouldn't take it. Well, once again, there's a lot of conflicting testimony. The girlfriend's testimony is completely not credible because in one incident she says we were supposed to get ---- We have two sworn statements, right? One of which cannot be true. So she either lied the first time when she was interviewed by immigration investigators or she lied when she submitted the declaration 12 years later, right? Which was obtained by a private investigator. They're totally inconsistent. Correct. So we've got ---- but even so, if you look at the girlfriend's testimony back that the investigator took, there's conflicting testimony there. On one hand, she says, look, he offered me money to marry him. On the other hand, she says we were planning to get married on February of 1999. So you can't have both. Well, I found out that he was married to somebody in Jerusalem. But what ---- I mean, I can't figure out how many wives this guy has. One. Really? Well, I'm not so sure. And two. Maybe two.  Maybe three. But all the conflicting testimony brings me to an important point. 13 years later, to try to submit this on paper is very difficult. We need ---- But I thought you were arguing that he didn't have adequate time in order to meet the charge. And I'm trying to figure out why 13 years is not enough. No. I wasn't saying that they didn't have adequate time. What I was saying was the available amount of evidence in this case for him to put on a meaningful defense is limited. And especially if he has to do that on paper. Which is why Chin becomes very important in this case, because his ability to be able to examine and cross-examine witnesses in this case becomes more important the further we get away from the incident and the less paper evidence we have. So what additional facts would be adduced at an adversary proceeding when we have the original statements, the sworn declaration obtained by the immigration investigator, and the sworn recantation obtained by your investigator? What additional evidence would you hope to adduce at that hearing that would change the result? I think that there needs to be some questions surrounding how she was questioned by the government. Are you basically talking about the ability to cross-examine? Is that it? I think there is a lot of evidence that we could get from these two witnesses. Some of the issues that were actually raised in the decision by U.S. Okay. You have potential questions. Are you saying as a matter of law, as a matter of due process, that your client was entitled to cross-examine these witnesses without saying this is what we anticipate they would say? And that's my question. I want to know. We do know what they're going to say because they've got declarations that come in late. They're going to stick by the second statement. If I'm looking at which party wants cross-examination, I'm the government. I want cross-examination of these people. Maybe not. I mean, what happens if the witness comes in this time around, now sitting in front of a United States magistrate judge, sworn to take an oath to tell the truth in a federal proceeding, and the witness says, you know what? I think I need a lawyer because I'm potentially at risk for a prosecution for perjury here. And anything that I say now in this hearing may well render me liable for prosecution for perjury or for submitting false statements to the government. And, therefore, I'm not going to answer any questions. And you're not going to get an opportunity to cross-examine. I don't know that that has any bearing on his right to due process and his right to be able to have that hearing. Well, it's going to deprive your client of the opportunity to propound the questions that you wish to propound. And you still haven't told me what answers you expect to receive once those questions are posed. So there were several answers or assumptions that were made by USCIS. When they briefly mentioned her recantation, they said, well, she didn't explain why she did this. She didn't explain this. She didn't explain this. There was a limited amount of information that she would give to my investigator, and I will note that it was signed under penalty of perjury law and it was notarized. But as a ‑‑ I mean, she has no obligation whatsoever to recant her testimony. None of these parties have seen each other for years. But you're missing my point. My point is that the witness is now in jeopardy of criminal prosecution. No matter what she says, if she admits to the statements that she made originally to the immigration inspector, then she lied in the later declaration that she swore to recanting those statements. If she sticks by her statements recanting, she has now admitted that she lied under oath in the prior proceeding. And I'm done in three minutes. My point is, I can't predict what the witness will or will not do. What I want to focus on is my client's right to due process. And it's not just the witnesses, but it is the investigator. You have to convince us that this hearing is actually going to result in the production of evidence that will make a difference in this case, that will show that the relief that you originally sought should have been granted. And if you have no idea what the witness is going to say, if the witness will say anything at all, then how have you shown an entitlement to a due process hearing when you can't show prejudice? Well, I think, first of all, I can't say what the witnesses are going to say. I'm going to presume that they seem pretty remorseful to my investigator in agreeing to, you know, submit a recantation declaration, which I think is really important in this case. I mean, it does raise some highlights why two independent women who haven't seen these parties in years comes forward and says, hey, what we did was wrong. Aren't you – isn't it really – you were getting back to the same argument, which is you believe we have statements, you believe that you need to cross-examine those statements, and perhaps, even if they aren't lying under oath, and I agree with Judge Tallman, that's a real issue, then you want to bring out the explanation. But I believe that there is Ninth Circuit authority that says that you are not entitled to cross-examine, and the Ninth Circuit authority that I'm familiar with is Ching v. Mayorkas. Well, in Ching, the Ninth Circuit found that she was entitled to cross-examine, particularly, and they went through the Matthews test, and in balancing the factors, in that case, I believe she was. And I know it's on a case-by-case basis, and – But she hadn't had access to the witnesses, had she? It cruelly says, as I understand that opinion, there is no due process right to cross-examine. It says that it's on a case-by-case basis. And so I would like to look – I want to analyze the factors in this case to discuss things like, for example, and I have one minute left, but I wanted to detest the idea of the imminent deportation, because I think that that's really important, especially given today's political climate and the fact that he's of Arab descent. But he's not in removal proceedings now. No, but to be fair and honest, given the administration and today's political climate and the President's specific statements against Arabs and the fact that ISIS – I understand he fears the knock at the door, but it hasn't come yet. Or the McCarthy era, going after Arabs. Yeah. But the point is, is given that ISIS stepped up their enforcement, this has completely – and the government even said if there's some imminent danger, and I think given this political climate, there is an imminent danger. I'm going to reserve my – Your 15 seconds. Thanks. We'll give you enough time. Don't worry. Okay. Good morning. Brian Moore on behalf of Appellees. Your Honors, the question presented by this case is whether due process requires USCIS to adopt formal trial-like procedures, the right to cross-examine witnesses in an informal adjudication of a visa petition in circumstances that are very different than what was presented to this Court in the Ching case. And those differences in circumstances are important because under Matthews, the Supreme Court said that procedural protections depend on the circumstances. And so in the Ching case, this Court acknowledged that particularly in administrative proceedings, where due process generally does not require formal trial-like procedures, generally does not require the right to cross-examine witnesses, that this assessment should be done on a case-by-case basis. And so when you compare the underlying circumstances and factors in the Ching case and this case, they're both cases where a visa was denied on the basis of evidence of prior marriage fraud. But that's essentially where the circumstances, the similarities in the circumstances end. And so it's the second Matthews factor here, the risk of erroneous deprivation and the probable value of additional procedures that's decisive here. Excuse me. So in the Ching case, this Court was concerned with USCIS relying solely on a statement from an ex-spouse that was taken years after the marriage had deteriorated and the ex-spouse was in another relationship. This was the only evidence of marriage fraud in that case, and this Court thought that there was a high risk of erroneous deprivation when that's the only evidence of marriage fraud. Here, the evidence of marriage fraud is far more substantial. First, the statement from the ex-spouse was taken at the time of the USCIS interview. So Mr. Allivette's former spouse filed a visa petition for him. USCIS brought them in, separated them, asked them questions, and they couldn't give consistent answers about basic facts about the marriage. They'd been married for one year and nine months at this point. They couldn't give consistent answers about where they'd lived during that time  They were close. But not quite the same. I forget which one it was left out, the Maple address. Right. And then I picked them up at the airport. No, I didn't. Well, the Maple address is important because That's where he lived with the paramour. Right. So in addition to the statement of the ex-spouse, there's independent evidence here of marriage fraud. So there's a statement that Mr. Allivette himself gave to the police at this Maple address saying he was actually living with another woman, Ms. Botello. USCIS didn't rest on this evidence alone. They tracked down Ms. Botello. They got a sworn statement from her. She gave them a story that was remarkably similar to the story that Ms. Murillo gave them when she was confronted with the evidence of marriage fraud. Both these women said that he had approached them, offered to pay them between $3,000 and $5,000 to marry him solely to get an immigration benefit. Ms. Murillo also said that he had, before he asked her to do this for him, he had What about that marriage back in the Middle East that produces the torn photographs? Right. And there's some evidence in the record. This wasn't the central issue that was relied on USCIS or the BIA's decision, but there's evidence that there was another marriage. USCIS didn't stop there. They went and subpoenaed evidence that showed that Ms. Botello and Mr. Allivette actually had been residing at this address together. They had utility bill, a video account. So the evidence here is much more substantial. The evidence they submitted, the parties here and the party in Qing submitted in response is also quite different. So one of the procedural rights they get in a visa adjudication is notice of the adverse evidence and an opportunity to respond, what's been called the hallmarks of due process. So if USCIS identifies evidence of marriage fraud, they issue what's called a notice of intent to deny that lays out the evidence and, before making a decision, gives them an opportunity to submit other evidence to show, no, this was a bona fide marriage or to explain the adverse evidence. In Qing, this Court found the evidence that was submitted in response to be overwhelming, substantial, compelling, unrebutted. Ms. Qing submitted a 21-paragraph statement. It laid out in excruciating detail the intimate details of their life. She corroborated that with leases, utility bills, photos, photos from the wedding. Here, Mr. Allivette has never responded with a statement of his own. He's never explained the adverse evidence. He's never submitted this type of evidence, photos from the wedding, leases, evidence that shows that the marriage was intended to be a genuine marriage at the time it was entered. And so the risk of erroneous deprivation that this Court was worried about in Qing simply isn't present here. In addition, the additional value, probable value of additional procedures isn't present here either, because in the Qing case, the Court said, we have these two statements. This is the only evidence. We have on one side the ex-spouse's statement, and we have to weigh that against the statement of the beneficiary, Ms. Qing. Her statement's been corroborated by all this evidence. If you're going to find the statement of the ex-spouse to be dispositive, well, that's a situation in which cross-examination on this short six-line, undetailed statement could be helpful. Here, in response to the notice of intent to deny, Mr. Allivette had the opportunity to respond with evidence, and he tracked down these witnesses. He tracked down Ms. Patello and Ms. Murillo and got statements from them. USCS considered those and explained why they were insufficient. But essentially, he's had an opportunity to submit evidence from those witnesses. So the additional procedures he's asking for here is an opportunity to cross-examine his own witnesses. And so both the risk of erroneous deprivation and the probable value of additional procedures don't weigh in favor of finding a due process right to cross-examine witnesses here. Also, the — so on the first Matthews factor and the third Matthews factor, both of those weighed in favor of cross-examination in the Ching case. Both of those weigh in the opposite direction here. Again, in Ching, the Court was concerned that getting approval of this visa was the only way to get out of removal proceedings and avoid imminent removal. Very different situation here. And on the third Matthews factor, the burden — administrative and financial burden on the agency. This is an adjudication that happens before a USCS adjudicator. This is not an adjudication that happens in immigration court. This is not removal proceedings. It doesn't happen in a court. It doesn't happen in a situation before an agency that's used to holding evidentiary hearings. And so to extend the fiscal and administrative burden of having an evidentiary hearing, essentially a full trial on every aspect of fraud the agency identifies in a situation where the beneficiary hasn't been able to submit a statement, hasn't been able to submit really very much evidence at all, almost zero evidence that it was a bona fide marriage at the outset, this would essentially extend the right to a trial in a visa adjudication to almost all cases. This would grind the agency to a halt, and they wouldn't be able to conduct their business of approving genuine visas because they'd be spending all their time having to prove at such a high level fraud in a situation where the burden's on the petitioner to put forth evidence that they're entitled to approval of the visa. Is there any evidence in the record as to how common marriage fraud is? My understanding is that it's a fairly common issue that the agency encounters, but I don't know from what source I know that. I don't know, Your Honor. I don't know how common an issue it is. But as I said before, in all of these cases, there's a regulatory right to notice of the adverse evidence. The BIA has read that right to apply, because of the seriousness of this marriage fraud bar, to apply in cases of marriage fraud. So in all cases, they get an opportunity to have notice of that evidence and an opportunity to respond. And so given the weight of, in particular, the weight of evidence in this case, they can't show under the Second Matthews Factor a right to, a due process right to cross-examination. And for similar reasons, their APA claim fails. There's no evidence in this record that compels a finding that that first marriage was bona fide. He's had multiple opportunities to submit additional evidence showing it was bona fide. He had an opportunity in the first visa adjudication. In this current visa adjudication, although they had denied the earlier petition on marriage fraud grounds, they didn't just rest on that again. They gave him notice of that prior marriage fraud and another opportunity to respond with additional evidence, and he wasn't able to do so. So unless the panel has any further questions, we'd ask that you affirm the district court's decision and deny both the APA and the due process claim. I think no further questions for you. You wanted 3 minutes. We took you way down. Why don't we put 2 minutes on the clock? So one of the things that I think is very important is that USCIS focused on two questions. One, the missing address, and one, the trip. There were several dozen questions that were asked, including such private matters as how many times a month the couple were intimate with each other, what the house looked like, they both do the same house, their jobs, the time they left for work, who got out of bed first. And not once in this decision do you see the government comment on those. They focused specifically on an address, and by the way, it was left out by him, and since the police report is there, we know he was at the address, so that was probably inadvertent. Well, I'm not so sure. Well, why would she say that she lived there and not him? I mean, if you're claiming she never lived there, it was her that said that they had lived there together. Isn't this the case where he was actually living with the girlfriend when he married? Is it Murillo? No, see, that's not accurate, and if you look at the 2000 police report, it says that the girlfriend broke in his house and stole items. It did not say that she lived there. The only evidence, supposedly, and that goes to show how angry she was. She stole his items or she removed items that belonged to her? She stole his items. Well, that was his report. It turns out, as we do the investigation, there's never any serious pursuing of allegation of theft. And I believe after that, there was some issue whether they were. I mean, it appears that this was a tumultuous relationship. They went back and forth. I think he was. I mean, no one's going to say this is the husband of the year. I mean, he was definitely apparently back and forth between both of these women. But that does not go to the intent at the inception of the marriage. Wasn't he living with the girlfriend when he married? No, he wasn't. And so that's not accurate information. I thought I read that in the record. Yeah. Okay, well, I'll check that. Okay. Okay. The other thing is that I want to say is that he did submit family statements. He not only submitted family statements, but he submitted a statement from her very good friend, which outlined things that they did together. And that, just because he didn't submit a statement like Chinn, the declarations that they completely discounted were as thorough as the Chinn declaration. And I know I'm out of time, but thank you. Thank you. Okay. Thank both of you for your arguments. The case of Alamed v. Crawford submitted for decision.
judges: W. Fletcher, Tallman, Silver